# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 14-CV-6097 (JFB)(ARL)

BROOKHAVEN TOWN CONSERVATIVE COMMITTEE, ET AL.,

Plaintiffs,

VERSUS

EDWARD M. WALSH, JR., ET AL.,

Defendants.

**MEMORANDUM AND ORDER**
June 15, 2017

JOSEPH F. BIANCO, District Judge:

Plaintiff Brookhaven Town Conservative Committee ("BTCC"), along with several individuals and corporate entities (collectively, "plaintiffs"), brings this action against defendants Edward M. Walsh, Jr. ("Walsh"), Suffolk County Conservative Party of New York State (the "SCCP"), Suffolk County Conservative Chairman's Committee H.K., and Suffolk County Conservative Chairman's Club (collectively, ("defendants"). Plaintiffs allege (1) an 18 U.S.C. § 1962(c) cause of action predicated on mail and wire fraud claims that stem from Walsh's purported diversion of monetary donations; and (2) a New York State law fraudulent inducement claim.

This is plaintiff BTCC's third attempt to plead a claim under the Racketeer Influenced and Corrupt Organizations ("RICO") Act. By Memorandum and Order dated March 23, 2016 (the "Memorandum and Order"), the Court dismissed BTCC's First Amended Complaint ("FAC") but granted leave to re-plead. *See Brookhaven Town Conservative Comm. v. Walsh*, No. 14-CV-6097 (JFB)(ARL), 2016 WL 1171583, at *1 (E.D.N.Y. Mar. 23, 2016). The Court concluded that BTCC had failed to allege a cognizable RICO injury based on the "the loss of its Wilson-Pakula authority"—an authorization given by a New York political party that allows an individual not registered with that party to run as its candidate in a given election—because BTCC "had no right to the Wilson-Pakula authority in the first place." *Id*. at *1, 6. However, "in an abundance of caution," the Court permitted BTCC to file another pleading containing "additional factual allegations with respect to the alleged diversion of its funds." *Id*. at *7. The Court concluded that "it may be possible to allege a RICO injury based upon" such conduct, but cautioned that "it is entirely unclear that plaintiff could plausibly allege all of the elements of a civil RICO claim under this theory . . . ." *Id*.

Subsequently, on April 22, 2016, BTCC—together with plaintiffs Cartier, Bernstein, Auerbach & Dazzo, P.C.; Homeside Realty Group, Inc.; Johannesen & Johannesen, PLLC; Linda Boswell; Donald S. Sullivan; Brocato & Byrne, LLP; and Vincent Finnegan—filed a Second Amended Complaint ("SAC"), which principally alleges that Walsh committed mail and wire fraud by siphoning plaintiffs' contributions to the SCCP for his personal use. Defendants now move to dismiss the SAC pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6).

For the reasons set forth below, the Court again dismisses plaintiffs' RICO claim for failure to plead mail and wire fraud with the requisite particularity. Given plaintiffs' evident inability to state a plausible RICO claim despite multiple attempts to do so, this dismissal is with prejudice. Finally, the Court declines, in its discretion, to exercise supplemental jurisdiction over plaintiffs' New York State law claim and dismisses that cause of action without prejudice to re-filing in state court.

I. BACKGROUND

A. Factual Background

The Court takes the following facts from the SAC. (ECF No. 22.) The Court assumes these facts to be true for purposes of deciding this motion and construes them in the light most favorable to plaintiffs as the non-moving party.

Plaintiff BTCC is the governing body of the Town of Brookhaven Conservative Committee. (SAC ¶ 1.) BTCC was organized to conduct "a local political committee for purposes of promoting, screening, and nominating local candidates with conservative values within the Town of Brookhaven" and to raise money to support such candidates. (*Id.* ¶ 21.)

Defendant Walsh has been the Chairman of the SCCP since 2006. (*Id.* ¶¶ 10, 27.) The SCCP is the governing body of the Suffolk County Committee of the Conservative Party of New York State. (*Id.* ¶ 11.) After Walsh was elected as Chairman of the SCCP, he "caused to be formed" the political committees of defendants Suffolk County Conservative Chairman's Club (the "SCCCC") and Suffolk County Conservative Chairman's Committee H.K. (the "SCCCHK"); both are controlled by Walsh. (*Id.* ¶¶ 12-15, 28-29.) Plaintiffs allege that Walsh's "purposes, among others, are to increase his political clout in Suffolk County by absolutely and exclusively controlling the affairs of the BTCC (and similar committees within the County) and by diverting funds intended for the SCCP to his own purposes" through mail and wire fraud. (*Id.* ¶¶ 24, 31.)

Specifically, plaintiffs assert that, in or around 2009, Walsh "during the course of a Suffolk County Conservative Party Executive Committee meeting, placed a Resolution on the record granting himself a $65,000 per year annual stipend" that the SCCP Executive Committee unanimously approved. (*Id.* ¶ 30.) Further, at least twice a year since becoming Chairman, Walsh has sent fundraising announcements to members of all town committees and other registered conservatives by electronic and paper mail. (*Id.* ¶¶ 32, 34.) Walsh uses the SCCP's official seal and party mailing list to advertise and fundraise. (*Id.* ¶ 33.) The recipients of those fundraising announcements, including plaintiffs, donated money to advance the political goals of the SCCP. (*Id.* ¶ 37; *see also id.* ¶¶ 38-45 (delineating specific contributions made by plaintiffs in response to Walsh's solicitations).)

For instance, plaintiffs contend that fundraisers were held on or about June 20, 2011; October 19, 2011; October 30, 2012; April 1, 2014; and October 29, 2014. (*Id.*

¶¶ 62-66.) They allege that the invitations for those fundraisers stated that checks should be made out to the SCCCC, which is controlled exclusively by Walsh without oversight by other SCCP members. (*Id.*)

Plaintiffs further allege that the money received through those fundraisers is deposited into the bank accounts of either the SCCCHK or SCCCC, which are under Walsh's control, and that Walsh's monthly SCCP stipend of $5,117.00 is paid through those contributions. (*Id.* ¶¶ 46-47.) Walsh purportedly created both of these entities "to receive and divert funds intended to be contributed to the SCCP." (*Id.* ¶¶ 35-36.) Plaintiffs further allege that Walsh receives other funds for his benefit through the SCCCHK and the SCCCC that were never authorized by the SCCP Executive Committee, such as $1,200 per month for his car, gas reimbursement, insurance reimbursement, and miscellaneous office expenses. (*Id.* ¶¶ 48-49, 67.) Plaintiffs assert that, during 2013 and 2014, the majority of SCCCHK and SCCCC's expenditures were for Walsh's individual gain; specifically, SCCCHK's July 2014 disclosure to the New York State Board of Elections showed that of the $44,950.13 in total expenditures, $41,711.87 was used for Walsh's personal benefit. (*Id.* ¶ 68.)

B. Procedural Background

Plaintiff BTCC commenced this action on October 17, 2014 (ECF No. 1) and filed the FAC on November 24, 2014 (ECF No. 9). Defendants moved to dismiss on March 13, 2015 (ECF No. 16), and after the parties fully briefed that motion and the Court heard oral argument, the Court issued the Memorandum and Order dismissing the RICO claim with leave to re-plead (ECF No. 21).

Thereafter, plaintiffs filed the SAC on April 22, 2016. (ECF No. 22.) Defendants moved to dismiss that pleading on September 20, 2016 (ECF No. 29); plaintiffs filed their opposition on December 23, 2016 (ECF No. 32); and defendants replied on January 28, 2017 (ECF No. 34). The Court held oral argument on February 8, 2017 (ECF No. 35) and has fully considered the parties' submissions.

II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for courts deciding a motion to dismiss. 556 U.S. 662 (2009). The Supreme Court instructed district courts to first "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement to relief." *Id*. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly*, 550 U.S. at 556-57 (internal citation omitted)).

The Court notes that in adjudicating a Rule 12(b)(6) motion, it is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and reversed in part on other grounds sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), *cert. denied*, 546 U.S. 935 (2005); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he district court . . . could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim.").

III. DISCUSSION

Defendants move to dismiss the SAC on the following grounds: (1) plaintiffs lack standing; (2) plaintiffs fail to state a claim for a civil RICO violation; (3) the RICO claim is time-barred; (4) the SAC raises only non-justiciable political questions; and (5) plaintiffs fail to state a New York State law claim for fraudulent inducement. As set forth below, the Court concludes that plaintiffs have standing to assert their RICO claim but have failed to plead their mail and wire fraud claims with the requisite particularity.[1] The Court, therefore, dismisses that claim with prejudice. In addition, the Court declines, in its discretion, to exercise supplemental jurisdiction over plaintiffs' state law claim and dismisses that cause of action without prejudice to re-filing in state court.

A. RICO

1. Applicable Law

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "When § 1962 is violated, in addition to criminal penalties, the RICO

---

[1] Accordingly, the Court need not, and does not, address defendants' other arguments in support of dismissing the RICO claim, including that the communications at issue did not pass through interstate commerce and that plaintiffs have failed to plead a pattern of racketeering activity.

4

statutes also authorize civil lawsuits, which, if successful, can entitle a plaintiff to treble damages, costs, and attorney's fees." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010) (citing 18 U.S.C. § 1964(c)). Specifically, RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).

"To establish a civil RICO claim [under 18 U.S.C. § 1964(c)], a plaintiff must allege '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.'" *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (quoting *Anatian v. Coutts Bank Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999)). "The pattern of racketeering activity must consist of two or more predicate acts of racketeering." *Id.* (citing 18 U.S.C. § 1961(5)). Racketeering activity is defined as "any act which is indictable" under specified provisions of Title 18, including mail fraud, wire fraud, extortion, and bank fraud. 18 U.S.C. § 1961(1)(B).

Courts have described civil RICO as "'an unusually potent weapon—the litigation equivalent of a thermonuclear device.'" *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)), *aff'd*, 113 F.3d 1229 (2d Cir. 1997). "Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Id.* (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)); *see also DLJ Mortg. Capital*, 726 F. Supp. 2d at 236. Indeed, although civil RICO may be a "potent weapon," plaintiffs wielding RICO almost always miss the mark. *See Gross v. Waywell*, 628 F. Supp. 2d 475, 479-83 (S.D.N.Y. 2009) (conducting survey of 145 civil RICO cases filed in the Southern District of New York from 2004 through 2007, and finding that all thirty-six cases resolved on the merits resulted in judgments against the plaintiffs, mostly at the motion to dismiss stage). Accordingly, courts have expressed skepticism toward civil RICO claims. *See, e.g.*, *DLJ Mortg. Capital*, 726 F. Supp. 2d at 236 ("[P]laintiffs have often been overzealous in pursuing RICO claims, flooding federal courts by dressing up run-of-the-mill fraud claims as RICO violations.").

Although civil RICO presents many hurdles for a plaintiff to overcome, the Supreme Court has also "made clear that it would not interpret civil RICO narrowly." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 139 n.6 (2d Cir. 2001) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)). In *Sedima*, the Supreme Court rejected an interpretation of civil RICO that would have confined its application to "mobsters and organized criminals." 473 U.S. at 499. Instead, the Court held: "The fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Id.* (internal citation omitted); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 479 (2006) (Breyer, J., concurring in part and dissenting in part) ("RICO essentially seeks to prevent organized criminals from taking over or operating legitimate businesses. Its language, however, extends its scope well beyond those central purposes."). Thus, a court should not dismiss a civil RICO claim if the complaint adequately alleges all elements of such a claim, even if the alleged conduct is not a quintessential RICO activity.

5

2. Analysis

Here, plaintiffs have (for the third time) attempted to plead a RICO claim with mail and wire fraud as the alleged underlying predicate acts. (*See* SAC ¶¶ 50-72.) As a threshold matter, the Court concludes that plaintiffs have standing to assert that cause of action, but it determines that they have failed a state a plausible claim because they have not pled their fraud claims with the requisite particularity.

    a. Standing

"Standing" under RICO, for purposes of a motion to dismiss, is not a jurisdictional concept, but instead is analyzed as a merits issue under Federal Rule of Civil Procedure 12(b)(6). *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 116-17, 129-30 (2d Cir. 2003) ("We hold that lack of RICO standing does not divest the district court of jurisdiction over the action, because RICO standing, unlike other standing doctrines, is sufficiently intertwined with the merits of the RICO claim that such a rule would turn the underlying merits questions into jurisdictional issues. . . . In sum, despite describing the proximate causation requirement as 'RICO standing,' such standing is not jurisdictional in nature under Fed. R. Civ. P. 12(b)(1), but is rather an element of the merits addressed under a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim."). The Second Circuit has described RICO standing as "a more rigorous matter than standing under Article III." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006).

A plaintiff has standing to bring a RICO claim only if he has been injured in his business or property by the conduct constituting the RICO violation, and only when his actual loss is clear and definite. *See id.*; *see also Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 231 (E.D.N.Y. 2014) (same); *Westchester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 612-13 (S.D.N.Y. 2015) (collecting cases).

In the Memorandum and Order, the Court found that BTCC had failed to allege standing based on the loss of its Wilson-Pakula authorization because "such a claim ignore[d] the simple fact that plaintiff had no right to the Wilson-Pakula authority in the first place" since "the decision whether to grant or withhold Wilson-Pakula authority to a town committee is a discretionary determination . . . ." *Brookhaven*, 2016 WL 1171583, at *6. The Court further observed that the FAC did not sufficiently support BTCC's allegation that it "suffered injury based on a loss of diverted funds" and said that if BTCC wished to advance that claim, it "must file a second amended complaint that more fully sets forth such a theory of RICO injury." *Id.* at *6 n.2.

The SAC remedies this defect by enumerating "clear and definite" monetary contributions that plaintiffs made based on Walsh's (supposedly fraudulent) solicitations. (SAC ¶¶ 38-45.) Nevertheless, defendants summarily claim that, "[a]lthough the Second Amended Complaint alleges that plaintiffs have made political contributions, there is simply no plausible allegation of any injury in fact." (Defs.' Mot. Br., ECF No. 29-1, at 5.) However, assuming the truth of plaintiffs' allegations, their "economic losses would constitute an injury to both the plaintiffs' business and property. Money constitutes 'property' within the meaning of RICO." *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560, 569 (E.D.N.Y. 1999); *see also Astorino*, 137 F. Supp. 3d at 600 ("For both wire and mail fraud, the object of the scheme to defraud must be *money or property*."). Simply put, if defendants falsely represented that plaintiffs' financial donations would be

6

used for some purpose, such as SCCP political activities, and then used those funds for Walsh's personal benefit, then "defendants fraudulently induced plaintiffs to take actions and make expenditures that would result in their financial injury." *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 105 (2d Cir. 1993). This purported harm falls squarely within RICO's statutory ambit.[2] *See Kerik v. Tacopina*, 64 F. Supp. 3d 542, 560 (S.D.N.Y. 2014) ("Courts have required that the plaintiff show 'concrete financial loss' in order to show injury under RICO." (collecting cases)).

b. Particularity

As predicate acts for its RICO claim, plaintiffs allege that defendants engaged in mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.[3] (*See* SAC ¶¶ 50-72.) When alleging fraudulent activities as predicate acts for a RICO claim, a plaintiff must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172-73 (2d Cir. 1999). Accordingly, a RICO plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian*, 193 F.3d at 88. If "there are multiple defendants involved, the plaintiff must connect the allegations of fraud to each individual defendant." *Colony at Holbrook, Inc. v. Strata G.C., Inc.*, 928 F. Supp. 1224, 1231 (E.D.N.Y. 1996). For example, in *Moore*, the court held that a complaint met this heightened pleading standard where it "contain[ed] a chart listing twelve different mailings said to contain fraudulent representations, along with the dates of these mailings and cross-references to the paragraphs of the complaint in which the mailings [were] further discussed." 189 F.3d at 173; *see also ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1326 (S.D.N.Y. 1997) (holding that complaint met particularity requirement where, for each defendant, the "[p]laintiffs identif[ied] and quote[d] from specific written materials they allege[d] were distributed to and relied upon by them, and describe[d] how these materials were false or failed to disclose material information"). By contrast, in *Colony at Holbrook*, 928 F. Supp. at 1231, the court held that a complaint did not meet Rule 9(b)'s heightened pleading standard because it did not include "statements setting forth the content, date, or place of any alleged misrepresentations, and the identity of the persons making them." *Id.* (brackets omitted). Instead, the complaint "contain[ed] sweeping and general allegations of mail and wire fraud directed at all the defendants rather than connecting the alleged fraud to the individual defendants." *Id.*; *see also McGee v. State Farm Mut. Auto. Ins. Co.*, No. 08-CV-392 FB CLP, 2009 WL 2132439, at *5 (E.D.N.Y. July 10, 2009) (holding that a plaintiff failed to plead fraud with particularity where he "loosely allege[d] throughout his complaint that the defendants contacted each other by means of the mails and/or the wires, without specifying precise

---

[2] To the extent that defendants argue that plaintiffs lack Article III standing for failing to allege an injury-in-fact, the same pecuniary losses also satisfy that requirement. *See Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017) ("For [constitutional] standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

[3] "The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires." *Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 321 (S.D.N.Y. 2014) (quoting *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000)). "The elements of mail fraud under 18 U.S.C. § 1341 are identical, except that mail fraud must be furthered by use of the mails." *Id.*

methods of communication" or identifying "any specific fraudulent statement").

Further, although a plaintiff may "allege fraudulent intent generally" under Rule 9(b), he still "must provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent." *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995); *see also Moore*, 189 F.3d at 173. A complaint satisfies this standard by either (1) "alleg[ing] a motive for committing fraud and a clear opportunity for doing so" or (2) "identifying circumstances indicating conscious behavior by the defendant." *Powers*, 57 F.3d at 184. Under the "motive and opportunity" approach, "[a]lthough the desire to enhance income may motivate a person to commit fraud, allegations that a defendant stands to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)." *ABF Capital*, 957 F. Supp. at 1327 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)). Indeed, "a generalized profit motive that could be imputed to any company . . . has been consistently rejected as a basis for inferring fraudulent intent." *Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of Greater N.Y.*, No. 07-CV-1471 RRM/LB, 2009 WL 928718, at *6 (E.D.N.Y. Mar. 31, 2009) (collecting cases).

Meanwhile, under the "conscious behavior" approach, "the strength of the circumstantial evidence must be greater." *ABF Capital*, 957 F. Supp. at 1326 (citing *Powers*, 57 F.3d at 184). In *ABF Capital*, for example, a plaintiff adequately alleged "conscious behavior" indicative of fraud where the facts showed that the defendant "represented that it had reduced the art of valuing and modeling [collateralized mortgage obligations] to a 'proprietary, quantitative' science, when in fact it was relying on intuition and pressure from [its] Brokers." *Id.* at 1327. On the other hand, in *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 298 (S.D.N.Y. 2000), *aff'd,* 2 F. App'x 109 (2d Cir. 2001), the court concluded that a plaintiff did not allege "conscious behavior" that plausibly asserted fraudulent intent where the "facts [in the complaint could] only lead to the inference that [the defendant] and its principals successfully did business with their long-time business contacts," who had allegedly committed fraud.

Here, plaintiffs have not adequately particularized their fraud allegations. Like the complaint in *Colony at Holbrook*, the SAC does not identify any statements made by defendants that were fraudulent, much less the dates and the times those statements were made or the identities of the recipients. *See Colony at Holbrook*, 928 F. Supp. at 1231; *see also McGee*, 2009 WL 2132439, at *5. Instead, it merely asserts that Walsh "engaged in a scheme to unlawfully deprive the BTCC and all similarly situated plaintiffs of financial donations and contributions and to divert those resources to the SCCP" by "solicit[ing] contributions from registered Conservatives and Town Committees by mail and e-mail in April and October of each year referenced herein seeking contributions allegedly to be used for the benefit of and in furtherance of the business of the Conservative party." (SAC ¶¶ 53, 57.) The SAC then states that fundraisers were held on or about June 20, 2011; October 19, 2011; October 30, 2012; April 1, 2014; and October 29, 2014, and it alleges that the invitations for those fundraisers stated that checks should be made out to the SCCCC. (*Id.* ¶¶ 62-66.) The SAC does not, however, describe when the invitations for these events were mailed (or e-mailed), nor does it provide a recipient list.

These allegations are a far cry from *Moore*'s highly detailed chart that laid out with specificity the allegedly fraudulent

8

statements. 189 F.3d at 173. Instead, they are much closer to the "sweeping and general allegations of mail and wire fraud" that proved insufficient to meet Rule 9(b)'s heightened pleading standard in *Colony at Holbrook*. 928 F. Supp. at 1231. More to the point, the SAC does not "specify the statements that the plaintiff contends were fraudulent . . . state where and when the statements were made, and . . . explain why the statements were fraudulent." *Anatian*, 193 F.3d at 88; *see also Colony at Holbrook*, 928 F. Supp. at 1231; *McGee*, 2009 WL 2132439, at *5. Even assuming the truth of plaintiffs' core premise—that Walsh utilized money intended for the SCCP to make certain unauthorized expenditures—plaintiffs have not shown that he, or any other defendant, misrepresented what plaintiffs' donations would be used for. On the contrary, the SAC explicitly acknowledges that plaintiffs were instructed to make checks payable to the SCCCC and does not explain why that instruction was fraudulent. *Compare Houraney v. Burton & Assocs., P.C.*, 701 F. Supp. 2d 258, 262 (E.D.N.Y. 2010) (holding that plaintiff failed to explain why statement was fraudulent where it was "not necessarily inconsistent" with plaintiff's factual allegations), *with Nanjing Standard Int'l, Ltd. v. DMD Int'l Ltd.*, No. 12 CIV. 8248 LLS, 2013 WL 5882928, at *3 (S.D.N.Y. Oct. 25, 2013) (holding that plaintiff explained why statements were fraudulent where "[t]he complaint allege[d] that defendants' statements request[ed] port fees and customs taxes . . . [but] no such fees or taxes were due").

Notwithstanding these deficiencies, plaintiffs contend that "[i]nherent in the solicitations and the request by Defendant WALSH for payment from Conservative Party members is the inherent representation that these funds so collected will be utilized for the benefit of the Conservative Party and for the furtherance of conservative ideals and the party platform," as opposed to benefitting Walsh personally. (Pls.' Opp'n Br., ECF No. 32, at 5-6.) However, there is nothing in the SAC or the documents attached thereto that indicates that defendants represented to plaintiffs how they would spend their money. Plaintiffs submitted a copy of a fundraiser invitation with the SAC for a March 27, 2015 SCCP Annual Spring Dinner, which states that tickets for that event cost $200 per person and indicates that attendees could attain various sponsorship designations for additional contributions (for instance, an attendee could become an "Event Sponsor" with a donation of $25,000). (SAC, Exh. A.) That invitation does not, however, state how the SCCP or the SCCCC would spend those funds. Insofar as defendants did use such donations to remunerate Walsh with a monthly stipend and for his automobile-associated expenses (*see* SAC ¶¶ 47-49), those distributions could qualify as legitimate business expenditures.[4] At best, an improper "diversion of funds" to benefit Walsh that was not approved by the SCCP's Executive Committee only evinces a failure to comply with the SCCP's internal financial procedures, which, absent any misrepresentation to the contrary, does not establish a fraud on the plaintiff donors. *See de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1311 (2d Cir. 2002) (citing *Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 871 F.2d 1402, 1407 (8th Cir. 1989) ("[F]ailure to follow [internal policies and procedures] will not give rise to

---

[4] Defendants also claim that "[a]ll of the information regarding the expenditure of such funds is disclosed to the New York State Board of Elections and is publicly available for review," and that plaintiffs were, therefore, on notice of those expenses. (Defs.' Mot. Br. at 9.)

9

a cause of action in the absence of independent facts establishing fraud.")).

In sum, even assuming that "the amended complaint set[] forth the dates, locations, senders and recipient of the allegedly fraudulent communications, its assertions as to their contents and the reason each communication was fraudulent are conclusory." *Knoll v. Schectman*, 275 F. App'x 50, 51 (2d Cir. 2008). Further, the SAC's general contention that Walsh "engaged in a scheme to unlawfully deprive the BTCC and all similarly situated plaintiffs of financial donations and contributions" (SAC ¶ 53) is "the kind of conclusory allegation[] that Rule 9(b) is meant to dissuade," *Knoll*, 275 F. App'x at 51. "While courts have made an exception to the particularity requirements and have allowed 'allegations [to] be based on information and belief when facts are peculiarly within the opposing party's knowledge,' this exception 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations,' especially in the context of RICO claims." *Purchase Real Estate Grp. Inc. v. Jones*, No. 05 CIV. 10859, 2010 WL 3377504, at *8 (S.D.N.Y. Aug. 24, 2010) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)). Thus, for these reasons, plaintiffs have failed to plead their predicate mail and wire fraud claims with particularity and therefore cannot state a cause of action under RICO.[5] *See Town of Islip v. Datre*, --- F.3d ---, No. 16-CV-2156 (JFB), 2017 WL 1157188, at *13 (E.D.N.Y. Mar. 28, 2017).

B. Fraudulent Inducement

Plaintiffs also allege a fraudulent inducement claim under New York law. However, having determined that plaintiffs' federal claim does not survive defendants' motion to dismiss, the Court concludes that retaining jurisdiction over any state law claim is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiffs' state law claim because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99-CV-3608 (WK), 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental

---

[5] Moreover, even assuming that plaintiffs had sufficiently particularized their fraud claims against Walsh, they have not alleged any misrepresentations by defendants SCCP, SCCCC, or SCCCHK. Indeed, the SAC imputes all of the fundraising announcements and solicitations at issue to Walsh. For that independent reason, the RICO claim against defendants SCCP, SCCCC, and SCCCHK must be dismissed. *See Colony at Holbrook*, 928 F. Supp. at 1231.

jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claim against defendants given the absence of any federal claim against them that survives the motion to dismiss, and it dismisses plaintiffs' fraudulent inducement claim without prejudice to re-filing in state court.

### IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss the RICO claim with prejudice. Given the dismissal of plaintiffs' federal claim, the Court declines, in its discretion, to exercise supplemental jurisdiction over plaintiffs' state law claim for fraudulent inducement and, thus, dismisses this claim without prejudice to re-filing in state court. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated:   June 15, 2017
         Central Islip, NY

\*\*\*

Plaintiffs are represented by Thomas G. Teresky, 191 New York Avenue, Huntington, New York 11743. Defendants are represented by Timothy F. Hill and Vincent J. Messina, Jr. of Sinnreich, Kosakoff & Messina LLP, 267 Carleton Avenue, Suite 301, Central Islip, New York 11722.